# Illinois Official Reports

## Appellate Court

*People v. Jackson*, 2018 IL App (3d) 170125

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TYRELL JACKSON, Defendant-Appellant. |
| District & No. | Third District<br>Docket No. 3-17-0125 |
| Rule 23 order filed<br>Motion to publish allowed<br>Opinion filed<br>Rehearing denied | May 8, 2018<br><br>May 17, 2018<br>May 17, 2018<br>May 29, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Will County, No. 08-CF-734; the Hon. David Martin Carlson, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Peter A. Carusona, and Kerry J. Bryson, of State Appellate Defender's Office, of Ottawa, for appellant.<br><br>James W. Glasgow, State's Attorney, of Joliet (Patrick Delfino, David J. Robinson, and Richard T. Leonard, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

PRESIDING JUSTICE CARTER delivered the judgment of the court, with opinion.
Justices McDade and O'Brien concurred in the judgment and opinion.

## OPINION

¶ 1     Defendant, Tyrell Jackson, appeals his conviction for first degree murder. Defendant argues that the circuit court should have permitted him to withdraw his guilty plea because plea counsel failed to advise him of shoeprint evidence prior to the plea and plea counsel labored under a *per se* conflict of interest. Defendant also argues that the matter should be remanded for new postplea proceedings in strict compliance with Illinois Supreme Court Rule 604(d) (eff. Mar. 8, 2016). We affirm.

¶ 2                                    FACTS

¶ 3     Defendant, along with four codefendants, was charged with two counts of first degree murder (720 ILCS 5/9-1(a)(2), (a)(3) (West 2008)) for causing the death of John Rosales by shooting Rosales with a handgun. Defendant and the four codefendants were also charged with home invasion (*id.* § 12-11(a)(3), (a)(5)) and armed robbery (*id.* § 18-2(a)(4)). Defendant alone was charged with an additional count of home invasion (*id.* § 12-11(a)(5)). Assistant public defenders Edward Jaquays and Gabriel Guzman were appointed to represent defendant. Jaquays worked part time as a public defender and part time in private practice.

¶ 4     Defendant filed a motion to suppress statements that he made to the police. The trial court denied the motion. During several pretrial hearings, including the hearing on the motion to suppress, Nicole Moore was one of the assistant state's attorneys who appeared on behalf of the State.

¶ 5     The matter proceeded to a stipulated bench trial. The court found defendant guilty of first degree murder and sentenced defendant to 70 years' imprisonment. On appeal, we reversed defendant's conviction and remanded the matter for a new trial. *People v. Jackson*, 2012 IL App (3d) 100693-U, ¶ 55. We held that the trial court erred in denying defendant's motion to suppress his statements to the police. *Id.* ¶ 53.

¶ 6     On remand, Guzman and Jaquays were reappointed to represent defendant. On the day a jury trial was set to commence, one of the assistant state's attorneys informed the court that Nicole Moore was an associate in Jaquays's private law office at that time. The assistant state's attorney asked that defendant waive the conflict on the record. The following exchange occurred:

> "THE COURT: [Defendant], would you approach, sir? Would you approach with your attorney over here?
>
> *** I think that is a point that we should consider both for your sake and for Mr. Jaquays' sake.
>
> It's my understanding, [defendant], obviously I wasn't involved in the first trial, that one of the prosecutors on that trial was a lady, a female attorney named Nicole Moore. She was a prosecutor on the matter. And Miss Moore is now an associate with Mr. Jaquays; do you understand that?

THE DEFENDANT: Yes.

THE COURT: And what the prosecutor is asking you is does that bother you in any way, shape or form that—I understand that Mr. Jaquays is representing you as a Public Defender, is that right, sir?

[JAQUAYS]: Yes, Judge, I am.

THE COURT: And that she is part of his private law office, which is separate and apart, but we still would like to put on the record that you don't have any problem with that if you don't; is that all right with you?

THE DEFENDANT: I mean not really.

THE COURT: Stop.

THE DEFENDANT: He never talked to me about none of this.

THE COURT: Mr. Jaquays, here's what I'm going to do, I'm going to ask you to speak about this situation to [defendant].

[Defendant], nobody wants to put you in a situation where you are uncomfortable, at least of all Mr. Jaquays, so I'm going to give you a few minutes to speak about that situation that [the prosecutor] has brought up to you and explain to you what's going on here and take that minute. Go ahead. Take whatever time you want."

¶ 7 When the parties went back on the record, the court asked defendant if he still had any concerns. Defendant replied: "No, I'm fine. He explained to me the situation." The following exchange occurred:

"THE COURT: I'm going to phrase it this way, the fact that Miss Moore at some point I guess, like I said I wasn't involved in this case at that point, was one of the co-prosecutors in this case?

MR. JAQUAYS: That's correct.

[ASSISTANT STATE'S ATTORNEY]: She was.

THE COURT: And she is now part of his private law office; that gives you no concern, sir, you are comfortable?

THE DEFENDANT: Yeah, I'm all right."

¶ 8 The parties selected a jury. The next day, before opening statements, the parties advised the court that they had reached a plea agreement. Defendant agreed to plead guilty to first degree murder in exchange for a sentence of 25 years' imprisonment. The State agreed to amend the indictment to remove the allegation that defendant shot the victim with a handgun so that a mandatory 25-year firearm enhancement would not apply. The State gave the following factual basis for the plea:

"On April 1st of 2008, at approximately midnight, Naperville, Will County, Illinois, John Rosales was in his residence. He had a few friends there with him, including Eric Smith. At that time two individuals forced in the front door and made demand of money. During that time Eric Smith was struck with an object and John Rosales was struck with an object by those two men who forced their way in. That injury to John Rosales caused him to bleed profusely, and moments later after he left the residence Mr. Rosales died as a result of those injuries. This all occurred in Will County, Illinois.

Subsequently, a man by the name of Justin Harper was interviewed. He did give officers a statement stating that this defendant, along with a co-defendant, had come to

his residence prior to the forced entry into John Rosales's residence and asked to borrow a weapon. They also indicated to Mr. Harper what they intended to do. Based on that, Mr. Harper gave that statement to the investigators in this case, and this defendant was charged with murder."

The court asked defendant if he agreed that the State would be able to present such evidence, and defendant said yes. After admonishing defendant, the court accepted his plea.

¶ 9 Approximately two weeks later, defendant filed a *pro se* motion to withdraw his guilty plea. Defendant's motion alleged that his plea counsel operated under a conflict of interest and provided ineffective assistance. After conducting a preliminary *Krankel* inquiry, the court denied defendant's motion to withdraw his guilty plea. On appeal, we reversed and remanded for a new *Krankel* hearing before a different judge without the State's adversarial participation. *People v. Jackson*, No. 3-14-0417 (2016) (unpublished minute order).

¶ 10 On remand, the court held a new *Krankel* inquiry and appointed a Michelle Hansen to represent defendant in his postplea proceedings. Hansen, on behalf of defendant, filed an amended motion to withdraw guilty plea.

¶ 11 A hearing was held on the amended motion. Daren Jackson testified that defendant was the father of his sister's child. Daren stated that he was in the courtroom on the day that defendant pled guilty. Daren was sitting near the counsel bench. Daren overheard the state's attorney and defense counsel discussing defendant's case. The state's attorney said he had a witness who would testify that she tested footprints, and the footprints did not match defendant. The state's attorney told defense counsel that he wanted to let him know that because he did not put it in his report.

¶ 12 Defendant testified that on the day his second trial was set to commence, his attorneys' investigator informed him that the State had offered him 35 years' imprisonment. Defendant rejected the offer and said he wanted to go to trial. Defendant's attorneys negotiated with the prosecutors for about an hour. The State's offer went down, but defendant told his attorneys that he did not want to plead guilty. Defendant's attorneys told him that if he did not take the State's offer, he would spend the rest of his life in jail. Defendant testified that his attorneys never showed him or discussed with him any laboratory results concerning shoeprints or gunshot residue.

¶ 13 Defendant testified that the court asked him a series of questions prior to his guilty plea. When the court asked him if he was pleading freely and voluntarily, defendant initially told the court that he was forced. The court then rephrased the question. Defendant just stood there for a few minutes. The judge then looked at defense counsel and the prosecutor. The court said the jury would come in. Defendant "said something to [his] lawyer on the side." Defendant could not remember everything, but said he eventually "pleaded out."

¶ 14 Defendant testified that when he answered the court's questions during the plea colloquy, he did so out of fear. Defendant said that he never really wanted to plead guilty. Defendant stated: "I wanted to go to trial and Jaquays and Guzman guaranteed a conviction. They told me if I don't take this time, I am getting the rest of my life in jail. I was forced." Defendant believed that "[n]obody was going to fight for [him]" if he went to trial.

¶ 15 Guzman testified that he and Jaquays were appointed to represent defendant on a first degree murder charge. Jaquays was the first chair attorney. Guzman worked at the public defender's office at that time. Eventually, the matter was set for a jury trial. Guzman and

Jaquays selected a jury, and the trial was set to commence the next day. The morning the trial was to begin, Jaquays negotiated a plea agreement with the State in which the State agreed to a sentence of 25 years' imprisonment.

¶ 16    That same morning, the prosecutor informed Guzman that the evidence technician who was going to testify regarding ballistics was also going to testify that a shoe imprint that was taken at the crime scene did not match defendant. Guzman and Jaquays had not previously received written reports concerning that information. Guzman believed that he and Jaquays discussed the matter in front of defendant, but Guzman did not recall ever taking defendant aside and explaining what the prosecutor had told them. Guzman testified that he would have used the shoeprint evidence at trial, but he did not believe it carried much weight. Guzman stated that the alleged facts of the case were that there were multiple people inside the victim's residence, including four codefendants.

¶ 17    Guzman did not recall anything unusual about defendant's plea. Guzman noted that defendant did not answer all of the court's questions immediately, but did so eventually.

¶ 18    Guzman testified that Moore formerly worked for the state's attorney's office. Before defendant's first trial, Moore represented the State during the proceedings on the motion to suppress defendant's statements to the police. Guzman did not inform defendant that Moore subsequently became an employee of Jaquays. Guzman did not believe that Jaquays informed defendant either. The State informed the court that Moore worked for Jaquays. Guzman and Jaquays then discussed the matter with defendant off the record, and defendant decided to proceed with Jaquays and Guzman as counsel.

¶ 19    Guzman testified that he never threatened defendant that he would get life imprisonment if he did not plead guilty. Guzman told defendant that if he was found guilty following trial, he would likely receive the same sentence he received following the first trial, which was 70 years' imprisonment. Guzman believed that Jaquays "did tell [defendant] in different manners and different words that [he was] going to do the rest of [his] life." Guzman stated that Jaquays said this because defendant was likely to receive a sentence so long that it would exceed his life expectancy. Guzman stated that Jaquays did not threaten defendant. Rather, Jaquays explained that a long prison sentence was a risk of going forward with a trial.

¶ 20    The court denied the motion to withdraw guilty plea.

¶ 21                                    ANALYSIS
¶ 22                    I. Ineffective Assistance of Counsel
¶ 23    Defendant argues that the trial court erred in denying his motion to withdraw guilty plea because he received ineffective assistance of plea counsel. Specifically, defendant contends that that plea counsel "failed to explain exculpatory shoe print evidence to defendant prior to his pleading guilty."

¶ 24    We review challenges to guilty pleas based on claims of ineffective assistance of counsel under the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). That is, "a defendant must establish that counsel's performance fell below an objective standard of reasonableness and the defendant was prejudiced by counsel's substandard performance." *People v. Hall*, 217 Ill. 2d 324, 335 (2005). "[I]f the ineffective-assistance claim can be disposed of on the ground that the defendant did not suffer prejudice, a court need not decide

whether counsel's performance was constitutionally deficient." *People v. Griffin*, 178 Ill. 2d 65, 74 (1997).

¶ 25 "To establish the prejudice prong of an ineffective assistance of counsel claim ***, the defendant must show there is a reasonable probability that, absent counsel's errors, the defendant would have pleaded not guilty and insisted on going to trial." *Hall*, 217 Ill. 2d at 335. "[T]he question of whether counsel's deficient representation caused the defendant to plead guilty depends in large part on predicting whether the defendant likely would have been successful at trial." *Id.* at 336.

¶ 26 Here, defendant was not prejudiced by counsel's failure to explain the shoeprint evidence to him. Contrary to defendant's argument on appeal, the shoeprint evidence would not have lent "crucial weight to his defense that he was not involved in the offense." The shoeprint would have only shown that someone else's shoeprint was found on the door to the victim's residence. This was not inconsistent with the State's theory of the offense. When giving the factual basis for defendant's plea, the prosecutor stated that two individuals forced their way into the victim's residence. Presumably, the State would have argued that the shoeprint belonged to a codefendant. Guzman testified that he did not believe the shoeprint evidence carried much weight because there were multiple people inside the victim's residence, including four codefendants. Because the shoeprint evidence would have been of very little significance at a trial, there is no reasonable probability that defendant would have not pleaded guilty and insisted on going to trial if counsel had explained the shoeprint evidence to him prior to his plea.

¶ 27 II. Conflict of Interest

¶ 28 Defendant argues that the trial court erred in denying his motion to withdraw his guilty plea because Jaquays labored under a *per se* conflict of interest and defendant never validly waived the conflict. The parties agree that Jaquays labored under a *per se* conflict of interest in that Moore, a former assistant state's attorney who represented the State during the pretrial proceedings prior to defendant's stipulated bench trial, worked for Jaquays's private law office at the time of the plea. However, the parties dispute whether defendant validly waived this conflict.

¶ 29 "The fundamental right to effective assistance of counsel requires that defendants be afforded counsel who is free of conflicting interests." *People v. Olinger*, 112 Ill. 2d 324, 339 (1986). "The right to conflict-free counsel may be waived [citations], but such a waiver must be knowing [citation]. A defendant will not be deemed to have waived a conflict unless he is admonished as to the existence of the conflict and its significance." *Id.*; see also *People v. Coleman*, 301 Ill. App. 3d 290, 301 (1998) ("It is well settled that trial courts must adequately inform defendants of a conflict's *significance* before any waiver of such a conflict can be accepted. A defendant must actually understand how the conflict could affect his attorney's representation, before his right to a conflict-free attorney can be knowingly waived." (Emphasis in original.)).

¶ 30 Here, the trial court adequately admonished defendant as to the conflict and its significance. The court advised defendant that Nicole Moore had previously worked as a coprosecutor on his case. The court told defendant that Moore currently worked at Jaquays's private law office as an associate. While defendant initially had concerns about the conflict,

defendant told the court that he was fine with it after speaking with Jaquays regarding the matter.

¶ 31 We reject defendant's contention that the court failed to adequately explain the significance of the conflict and did not determine that defendant understood its potential effect. Defendant offers no explanation as to what specific, additional admonitions the trial court should have given to defendant before defendant could have knowingly waived the conflict. We note that "[t]he duty to admonish the defendant as to the general nature of the conflict does not mean that the trial court must painstakingly detail every potential ramification of a potential conflict." *Olinger*, 112 Ill. 2d at 340.

¶ 32 In reaching our holding, we acknowledge our supreme court's decision in *People v. Kester*, 66 Ill. 2d 162 (1977), which discussed a similar, though not identical, conflict scenario and its potential significance. *Kester* was not cited in either party's brief. In *Kester*, a former assistant state's attorney who had appeared on behalf of the State during several early hearings in the defendant's case was subsequently appointed as the defendant's public defender in a burglary case. *Id.* at 164.

¶ 33 At a hearing on unrelated charges, the *Kester* defendant indicated that he wished to file motions in his burglary case. *Id.* The court asked the defendant who was representing him in the burglary case, and the defendant told the court the name of his public defender. *Id.* at 165. The court asked if that public defender had been involved in the defendant's cases previously, and the defendant said no. *Id.* The court then stated: "You know some months past he was in the state's attorney's office and if he had any contact with those cases I am sure he would voluntarily withdraw from them." *Id.* The defendant then discussed an unrelated complaint he had about his public defender's representation. *Id.*

¶ 34 The *Kester* court held that a potential conflict of interest existed in that the defendant's court-appointed counsel had previously been involved in the prosecution of the case and that the defendant was not required to show actual prejudice. *Id.* at 167-68. The *Kester* court reasoned:

> "It is possible that defense counsel's former association with the prosecution could inure to the benefit of the accused. [Citation.] But there is also the possibility that the attorney might be subject to subtle influences which could be viewed as adversely affecting his ability to defend his client in an independent and vigorous manner. It might be contended, for example, that the advice and performance of court-appointed counsel in such a situation was affected by a subliminal reluctance to attack pleadings or other actions and decisions by the prosecution which he may have been personally involved with or responsible for. A defendant who has entered a plea of guilty might later suspect that his attorney's advice thereon had been influenced to some degree by a subconscious desire to avoid an adversary confrontation with the prosecution as a consequence of his previous participation in the case as the prosecuting attorney." *Id.*

The *Kester* court found that the defendant had not knowingly waived the conflict because the court did not admonish the defendant as to the significance of the conflict, and it did not appear that the defendant "was actually aware that his counsel had previously appeared on behalf of the prosecution in his burglary case." *Id.* at 168-69.

¶ 35 Here, unlike in *Kester*, the court explicitly admonished defendant regarding Moore's former involvement in his case and her employment with Jaquays's law office. The

- 7 -

admonitions given in the instant case were significantly more detailed than those given in *Kester*.

¶ 36 Also, given the specific facts of this case, the *Kester* court's concerns that appointed counsel could be reluctant to attack aspects of the State's case in which he was personally involved or advise the defendant to plead guilty due to "a subconscious desire to avoid an adversary confrontation with the prosecution as a consequence of his previous participation in the case as the prosecuting attorney" (*id.* at 167-68) do not equally apply. Jaquays had represented defendant since the beginning of the case and had always been in an adversarial position to the State. Additionally, Jaquays had already challenged the court's ruling on the motion to suppress, which was the principal aspect of the case that Moore had worked on. On appeal, defendant had obtained a favorable ruling on the suppression issue (*Jackson*, 2012 IL App (3d) 100693-U, ¶ 53), and the matter was no longer at issue.

¶ 37                                                    III. Rule 604(d) Certificate

¶ 38 Defendant argues that this case should be remanded for new postplea proceedings because his counsel failed to strictly comply with the certification requirement of Illinois Supreme Court Rule 604(d) (eff. Mar. 8, 2016). The version of Rule 604(d) in effect at the time of the proceedings provided:

> "The defendant's attorney shall file with the trial court a certificate stating that the attorney has consulted with the defendant either by phone, mail, electronic means or in person to ascertain defendant's contentions of error in the sentence and the entry of the plea of guilty, has examined the trial court file and both the report of proceedings of the plea of guilty and the report of proceedings in the sentencing hearing, and has made any amendments to the motion necessary for adequate presentation of any defects in those proceedings.
>
> * * *
>
> The certificate of counsel shall be in the following form:
>
> * * *
>
> I, _____, attorney for Defendant, certify pursuant to Supreme Court Rule 604(d) that:
>
>     1. I have consulted with the Defendant in person, by mail, by phone or by electronic means to ascertain the defendant's contentions of error in the entry of the plea of guilty and in the sentence;
>
>     2. I have examined the trial court file and report of proceedings of the plea of guilty and the report of proceedings in the sentencing hearing; and
>
>     3. I have made any amendments to the motion necessary for the adequate presentation of any defects in those proceedings." *Id.*

¶ 39 The Rule 604(d) certificate filed by counsel in this case stated:

> "Pursuant to Illinois Supreme Court Rule 604(d), I the undersigned attorney certify to the Court the following:
>
>     1. I have consulted with the defendant X by mail X in person to ascertain defendant's contentions of error in the sentence and the entry of the plea of guilty;

2. I have examined the trial court file and the report of proceedings of the plea of guilty;

3. I have made any amendments in the motion necessary for adequate presentation of any defects in those proceedings."

¶ 40 Defendant argues that the Rule 604(d) certificate filed by counsel failed to strictly comply with Rule 604(d) because the certificate failed to (1) use the word-for-word language of the preprinted certificate contained in the rule and (2) state that counsel had reviewed the report of proceedings of defendant's sentencing hearing. We address each argument in turn.

¶ 41                          A. Failure to Copy Preprinted Certificate Verbatim

¶ 42 Defendant contends that counsel failed to strictly comply with Rule 604(d) because the certificate she filed did not use the word-for-word language of the preprinted certificate contained in the rule. Defendant argues that the use of the phrase "shall be in the following form" in Rule 604(d) indicates that it was mandatory for counsel to use the exact language of the preprinted certificate.

¶ 43 We find that failure to track the verbatim language of the preprinted certificate contained in Rule 604(d), without more, did not render counsel's certificate noncompliant. Rule 604(d) stated: "The certificate of counsel shall be in the following form ***." *Id.* This language was somewhat ambiguous because the word "form" can have several meanings. For example, "form" can mean (1) "[t]he outer shape, structure, or configuration of something, as distinguished from its substance or matter"; (2) "[a] model; a sample; an example"; (3) "[t]he customary method of drafting legal documents, usu[ally] with fixed words, phrases, and sentences"; or (4) "[a] legal document with blank spaces to be filled in by the drafter." Black's Law Dictionary (10th ed. 2014).

¶ 44 We believe that the first definition best fits the meaning of the word "form" as used in Rule 604(d). Stated another way, we believe that the directive "[t]he certificate of counsel shall *be in the following form*" (emphasis added) (Ill. S. Ct. R. 604(d) (eff. Mar. 8, 2016)) meant that the certificate shall be in the general format of the preprinted certificate, not that the certificate was required to track the word-for-word language of the preprinted certificate. Notably, Rule 604(d) did not say that "the certificate shall *use* the following form" or "the certificate shall use the following wording verbatim."

¶ 45 Our interpretation of the version of Rule 604(d) in effect at the time of defendant's postplea proceedings is consistent with the current version of Rule 604(d). The rule has been amended such that the phrase "[t]he certificate of counsel shall be in the following form" has been removed. See Ill. S. Ct. R. 604(d) (eff. July 1, 2017). Instead, the rule currently states: "The certificate of counsel shall be prepared by utilizing, or substantially adopting the appearance and content of, the form provided in the Article VI Forms Appendix." *Id.* The preprinted certificate that was formerly contained in the rule is now contained in an appendix. *Id.* The current version of the rule explicitly gives counsel the option to "substantially adopt[ ]" (*id.*) the preprinted certificate, which indicates that counsel is not required to copy it verbatim. We do not believe that the amended version of Rule 604(d) represents a substantive change in the rule. Rather, the amendment is consistent with the previous version of the rule.

¶ 46                B. Failure to Certify Review of the Transcript of the Sentencing Hearing

¶ 47       Having found that the failure to track the preprinted certificate's language verbatim did not render the certificate noncompliant, we turn to defendant's claim that the substance of counsel's certificate did not strictly comply with Rule 604(d) because counsel failed to certify that she had reviewed the report of proceedings of defendant's sentencing hearing. Because defendant had no sentencing hearing, we find that counsel did not fail to strictly comply with the certification requirement of Rule 604(d).

¶ 48       Strict compliance with Rule 604(d) is required. *In re H.L.*, 2015 IL 118529, ¶ 8. "The failure to strictly comply with each of the provisions of Rule 604(d) requires 'remand to the circuit court for the filing of a new motion to withdraw guilty plea or to reconsider sentence and a new hearing on the motion.' " *People v. Grice*, 371 Ill. App. 3d 813, 815 (2007) (quoting *People v. Janes*, 158 Ill. 2d 27, 33 (1994)).

¶ 49       On the unique facts of this case, we find that counsel strictly complied with the requirements of Rule 604(d), despite her failure to certify that she reviewed the report of proceedings of the sentencing hearing because there was no sentencing hearing in this case. Rather, the parties presented a fully negotiated guilty plea to the court. After admonishing the defendant, the court accepted his guilty plea and sentenced him to the agreed-upon sentence. The only discussion of defendant's sentence was contained in the transcript of the guilty plea hearing. Thus, by certifying that she had reviewed the report of proceedings of the plea of guilty, counsel also certified that she had reviewed the transcript of the court's discussion of defendant's sentence.

¶ 50       In reaching our holding, we acknowledge that in *Grice*, the Fourth District held that "in this case and henceforth, the certificate itself is all that this court will consider to determine compliance with Rule 604(d)." *Id.* at 816. This rule has been widely followed by other courts. See *People v. Hobbs*, 2015 IL App (4th) 130990, ¶ 38; *People v. Willis*, 2015 IL App (5th) 130020, ¶ 22; *People v. Herrera*, 2012 IL App (2d) 110009, ¶ 13. In support of this rule, the *Grice* court reasoned: " '[A] waste of judicial resources occurs when, as a result of an attorney's deficient certificate, an appellate court must scour through the record to determine whether that attorney actually complied with Rule 604(d), even though strict compliance with that rule's certification requirements would prevent such waste.' " *Grice*, 371 Ill. App. 3d at 816 (quoting *People v. Dismuke*, 355 Ill. App. 3d 606, 609 (2005)).

¶ 51       Here, on the other hand, we do not need to scour the record in search of evidence that counsel performed the duties set forth in Rule 604(d), despite failing to so state in her certificate. Rather, we look to the record only to note the readily apparent fact that no sentencing hearing was held. In this situation, it would be a far greater waste of judicial resources to remand this matter to the trial court for counsel to certify that she reviewed a transcript that does not exist.

¶ 52                                 CONCLUSION

¶ 53       For the foregoing reasons, the judgment of the trial court is affirmed.

¶ 54       Affirmed.