# Illinois Official Reports

## Appellate Court

---

### *People v. Schnoor*, 2019 IL App (4th) 170571

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. VINCENT P. SCHNOOR, Defendant-Appellant. |
| District & No. | Fourth District<br>No. 4-17-0571 |
| Filed | November 12, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Sangamon County, No. 15-CF-1189; the Hon. Ryan M. Cadagin, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and John R. Breffeilh, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Daniel K. Wright, State's Attorney, of Springfield (Patrick Delfino, David J. Robinson, and Thomas R. Dodegge, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE STEIGMANN delivered the judgment of the court, with opinion.<br>Presiding Justice Holder White and Justice DeArmond concurred in the judgment and opinion. |

**OPINION**

¶ 1    In November 2015, the State charged defendant, Vincent P. Schnoor, with aggravated robbery (720 ILCS 5/18-1(b)(1) (West 2014)), financial institution robbery (*id.* § 17-10.6(f)), and misappropriation of financial institution property (*id.* § 17-10.6(a)).

¶ 2    In March 2016, defense counsel moved "for a fitness exam to determine whether a *bona fide* doubt exists with respect to" defendant's fitness to stand trial. The trial court appointed a psychiatrist who later submitted a report in which he concluded that defendant was fit to stand trial. In April 2016, the parties stipulated to the findings and conclusions in that report.

¶ 3    In February 2017, the trial court conducted a plea conference pursuant to Illinois Supreme Court Rule 402(d) (eff. July 1, 2012) at which the State indicated it would agree to 15 years in prison in exchange for defendant's guilty plea. The court stated that the State's offer was reasonable and appropriate. However, defendant rejected the State's offer.

¶ 4    In May 2017, a jury trial was held at which the State introduced evidence of other crimes— namely, (1) a witness testified that he found contraband unconnected to these charges in defendant's vehicle and (2) the State presented a recorded interview of defendant in which he admitted that he robbed automated teller machines (ATMs/ATM). The jury found defendant guilty.

¶ 5    In July 2017, at a hearing on defendant's motion for a new trial, defendant *pro se* presented written complaints about problems he perceived in the trial proceedings. The trial court did not inquire into defendant's complaints at that time. The court later denied the posttrial motion and sentenced defendant to 25 years in prison.

¶ 6    Defendant appeals, arguing that (1) he was denied due process when the trial court failed to conduct an independent fitness inquiry and instead relied on the parties' stipulation, (2) defense counsel was ineffective for failing to object to other-crimes evidence, (3) the trial court erred when it failed to conduct an inquiry pursuant to *People v. Krankel*, 102 Ill. 2d 181, 464 N.E.2d 1045 (1984), regarding defendant's written complaints, (4) the trial court violated defendant's right to due process by imposing a longer sentence because defendant exercised his right to a trial, and (5) defendant's sentence was harsh and excessive. We disagree and affirm.

¶ 7                                    I. BACKGROUND
¶ 8                                    A. The Charges
¶ 9    In November 2015, the State charged defendant with aggravated robbery (720 ILCS 5/18-1(b)(1) (West 2014)), financial institution robbery (*id.* § 17-10.6(f)), and misappropriation of financial institution property (*id.* § 17-10.6(a)). At arraignment, the trial court admonished defendant that, due to his criminal record, both robbery charges would be deemed Class X felonies if he were convicted.

¶ 10                                   B. The Fitness Proceedings
¶ 11    In March 2016, defense counsel moved "for a fitness exam to determine whether a *bona fide* doubt exists with respect to" defendant's fitness to stand trial. The trial court appointed a psychiatrist, Dr. Terry Killian, to examine defendant and prepare a report regarding

defendant's fitness to stand trial. Killian later submitted a report in which he concluded that defendant was fit to stand trial. In April 2016, the parties stipulated to the findings and conclusions in that report. The trial court accepted the stipulation and set the case for trial. The record contains no further discussion about defendant's fitness.

¶ 12                                C. The Rule 402 Conference

¶ 13      In February 2017, the trial court conducted a plea conference pursuant to Illinois Supreme Court Rule 402 (eff. July 1, 2012) at the parties' request. During the conference, the State advised the court that a guilty verdict would result in a mandatory Class X sentence due to defendant's criminal record. The State informed the court that because defendant used a fake handgun and confessed to robbing the bank, the State was willing to accept a negotiated plea for 15 years in prison. (The prosecutor did not specify to which charge the proposed plea agreement would apply.) The State further stated that it would recommend 15 to 18 years in prison if defendant entered an "open plea."

¶ 14      Defense counsel stated that defendant was willing to plead guilty in exchange for 10 years in prison and asked the court if it would sentence defendant in excess of 15 years if he entered into an open plea. The court stated that the State's offer of 15 years was reasonable and appropriate and also stated that a sentence imposed pursuant to an open plea might be above or below the State's recommendation, depending on the evidence presented at sentencing.

¶ 15      Defendant rejected the State's plea offer and declined to enter a guilty plea. In May 2017, defendant rejected the State's amended plea offer for 14 years in prison. Prior to trial, the State dismissed the misappropriation of financial institution property charge.

¶ 16                                D. The Jury Trial

¶ 17      Defendant's jury trial was conducted in May 2017. During the State's case-in-chief, numerous witnesses testified. Their testimony indicated that in November 2015, defendant robbed Marine Bank in Springfield, Illinois. He covered his face with a mask and used a fake firearm. After the robbery, defendant got into a car crash with another person, who called the police.

¶ 18      The police ultimately tracked defendant down and brought him in for questioning, during which he made numerous incriminating statements. After defendant was arrested, he contacted his coworker, Larry Bass, to get money from defendant's hotel room. While in that room, Bass and defendant's employer, Robert Ewa, found a large sum of currency. Ewa picked up some of that currency and later turned it over to the police. The currency was traceable to Marine Bank by serial number. The police found and searched defendant's vehicle and recovered numerous incriminating items from it, including a BB gun.

¶ 19      Kevin Echols testified that, in November 2015, he discovered that a laptop computer, radios, a jacket, and other personal items were missing from his vehicle. Later in November 2015, Echols was shown photographs that depicted the person robbing the bank, and Echols recognized the jacket the robber was wearing in those photographs as the one missing from his vehicle. Echols testified that the jacket was from American Family Insurance and had been given to him by his girlfriend, who worked for American Family Insurance. Echols was shown a photograph from a County Market grocery store surveillance video. The photograph shows a man with his face uncovered and wearing a jacket. Echols identified the jacket as his and as

the same one that was missing from his vehicle and that was in the photograph of the bank robber. Other witnesses identified the man in the County Market surveillance video as defendant.

¶ 20 Detective Timothy Zajicek of the Springfield Police Department testified that he interrogated defendant, and a recording of that interrogation was played for the jury. Approximately 20 minutes into the video, defense counsel objected to a statement in which defendant admitted to robbing ATMs. The State responded that it had made all the redactions requested by defense counsel. Defense counsel withdrew her objection, stating that they agreed that mention of the ATM burglaries would be redacted from the video, and she accepted the State's assurances that the video complied with their agreement. However, defense counsel did not renew her objection when the ATM crimes were repeatedly mentioned in the rest of the recorded interrogation viewed by the jury.

¶ 21 Defendant testified at trial and admitted that he robbed the Marine Bank. However, defendant explained he thought his employer, Ewa, was going to kill defendant unless he robbed the bank to give Ewa money. Defendant also testified that he mistakenly believed his coworker, Larry Bass, was a federal law enforcement officer and that Bass told defendant to rob the bank as part of a federal sting operation targeting Ewa.

¶ 22 On cross-examination, defendant acknowledged that he did not mention his belief he was a part of a sting operation when he initially was interrogated by the police. Instead, he wrote a statement for the police during the interrogation in which he said that he thought he had two choices: (1) either kill Ewa or (2) cause an investigation of Ewa by going to his bank and causing a "suicide by another person incident." He also acknowledged that he initially told the police he was not involved in the bank robbery.

¶ 23 In closing argument, defense counsel acknowledged the overwhelming evidence against defendant but asserted that defendant had proved the affirmative defenses of compulsion and mistake of fact.

¶ 24 The jury found defendant guilty of aggravated robbery and financial institution robbery.

¶ 25 E. The Allegations of Ineffective Assistance of Counsel

¶ 26 In June 2017, defense counsel filed a motion for a new trial. In July 2017, the trial court conducted a hearing on that motion at which defense counsel told the court that defendant felt that counsel had not addressed in the posttrial motion all the issues defendant wanted addressed. Defense counsel also informed the court that prior to the hearing, defendant gave counsel a document on which defendant had written the additional issues defendant wanted addressed, and counsel attached that document to her posttrial motion as "Defendant's Addendum." That document reads as follows:

"1. The usage of other crimes evidence involving the idea created a prejudicial effect that outwit [*sic*] it's [*sic*] probative value when combined with Agent Echols testimony.

2. The state failed to establish chain of custody for def's handwritten statement for the time period of 9:14:31pm to

3. The usage of other crimes evidence involving atm's."

¶ 27 Defense counsel asked the trial court to amend her motion by incorporating therein the arguments in "Defendant's Addendum." The court granted her request and then denied the

motion.

¶ 28                                      F. Sentencing

¶ 29         Immediately following the hearing on the motion for a new trial, the trial court conducted
the sentencing hearing at which neither party offered any evidence. The State recommended
25 years in prison and argued in support thereof that (1) defendant's conduct threatened serious
harm, (2) defendant has a history of criminal activity, (3) the sentence should be designed to
deter others, and (4) the trial court should give defendant a greater sentence "because a lenient
sentence in this case could send a message that one could commit a notorious, serious crime,
get to take the stand, manufacture a completely outrageous story and receive a lenient sentence,
and that's not the correct message that this court should send ***." The State also argued that
the court should consider defendant's plans to use helicopters to break other people out of
prison as an indication that the prospect of incarceration did not deter him from future criminal
plans.

¶ 30         Defense counsel argued that (1) defendant acted under a strong provocation, (2) there were
grounds tending to excuse or justify his conduct, (3) his criminal conduct was induced or
facilitated by someone other than defendant, and (4) defendant's mental health and traumatic
childhood should be considered in mitigation. Defense counsel recommended a sentence of 12
to 14 years in prison.

¶ 31         The trial court stated that in sentencing defendant, it had considered all the evidence at trial,
the presentence investigation report, the arguments of the attorneys, the statement of allocution,
and all relevant factors in aggravation and mitigation. The court then sentenced defendant to
25 years in prison. Immediately thereafter, defense counsel stated she would place a motion to
reconsider sentence on file to be heard the following day.

¶ 32                      G. Ineffective Assistance of Counsel Inquiry

¶ 33         The following day, the trial court conducted a hearing on the motion to reconsider sentence.
After the court denied the motion, defense counsel notified the court that defendant wanted to
address the court regarding ineffective assistance of counsel claims. Defendant specifically
mentioned a *Krankel* hearing, but the court did not conduct a *Krankel* hearing at that time.

¶ 34         The next day, the trial court conducted what it described as a "*Krankel* hearing, as it's
called, based off *People vs. Krankel*," in which it would inquire into defendant's allegations of
ineffectiveness. Defendant told the court he received "ineffective assistance of counsel"
because (1) defense counsel, the State, and the court violated his right to a speedy trial by not
following procedures for continuances, (2) defense counsel failed "to inform the court" of
*pro se* motions filed by defendant, and (3) defense counsel failed to investigate possible
conflicts between defendant and Judge Graves, who initially was the presiding judge in this
case before she recused herself.

¶ 35         The remainder of the inquiry proceeded as follows:

          "THE COURT: Thank you, Mr. Schnoor. Ms. Evans [(defense counsel)], did you
     do everything in your power to bring this case to trial in a timely manner?

          MS. EVANS: I—I did, Your Honor.

          THE COURT: Did you consider all motions, and you know, make your decisions
     on which motions to file and argue based off of trial strategy?

MS. EVANS: Yes, sir.

THE COURT: I'm going to find that Mr. Schnoor's claim is without merit."

¶ 36    This appeal followed.

¶ 37                                    II. ANALYSIS

¶ 38    Defendant appeals, arguing that (1) he was denied due process when the trial court failed to conduct an independent fitness inquiry and instead relied on the parties' stipulation, (2) defense counsel was ineffective for failing to object to other-crimes evidence, (3) the trial court erred when it failed to conduct an inquiry pursuant to *Krankel* regarding defendant's written complaints, (4) the trial court violated defendant's right to due process by imposing a longer sentence because defendant exercised his right to a trial, and (5) defendant's sentence was harsh and excessive. For the reasons that follow, we affirm.

¶ 39                               A. The Fitness Inquiry

¶ 40    Defendant first argues he was denied due process because the trial court did not conduct an independent fitness inquiry. By an "independent fitness inquiry," defendant means that the court was required to conduct a hearing on the question of defendant's fitness to stand trial at which the court would "exercise its own independent judicial discretion" instead of "blindly" accepting the attorneys' stipulations to the findings in Killian's report. The State concedes that the court erred by not conducting an independent fitness inquiry but argues the error was harmless beyond a reasonable doubt. We do not accept the State's concession and disagree with both parties because, on the facts of this case, defendant was not entitled to an independent fitness inquiry as a matter of law.

¶ 41                               1. *The Applicable Law*

¶ 42    "The due process clause prohibits the prosecution of a defendant who is unfit to stand trial." *People v. Westfall*, 2018 IL App (4th) 150997, ¶ 52, 115 N.E.3d 1148 (citing *People v. Gillon*, 2016 IL App (4th) 140801, ¶ 20, 68 N.E.3d 942). A defendant is unfit to stand trial if, because of his mental or physical condition, he is unable to understand the nature and purpose of the proceedings against him or to assist in his defense. 725 ILCS 5/104-10 (West 2014). A defendant is presumed to be fit. *Id.*

¶ 43    In relevant part, section 104-11 of the Code of Criminal Procedure of 1963 (Code) states as follows:

> "(a) The issue of the defendant's fitness for trial, to plead, or to be sentenced may be raised by the defense, the State or the [c]ourt at any appropriate time before a plea is entered or before, during, or after trial. When a bona fide doubt of the defendant's fitness is raised, the court shall order a determination of the issue before proceeding further.

> (b) Upon request of the defendant that a qualified expert be appointed to examine him or her to determine prior to trial if a bona fide doubt as to his or her fitness to stand trial may be raised, the court, in its discretion, may order an appropriate examination. However, no order entered pursuant to this subsection shall prevent further proceedings in the case. An expert so appointed shall examine the defendant and make a report as provided in Section 104-15." *Id.* § 104-11(a), (b).

¶ 44     In *People v. Hanson*, 212 Ill. 2d 212, 222, 817 N.E.2d 472, 477 (2004), the supreme court concluded that "[t]he mere act of granting a defendant's motion for a fitness examination cannot, by itself, be construed as a definitive showing that the trial court found a *bona fide* doubt of the defendant's fitness." The supreme court further concluded that "if after the [fitness] examination the trial court finds no *bona fide* doubt, [then] no further hearings on the issue of fitness would be necessary." *Id.* at 217.

¶ 45     "A *bona fide* doubt exists when the facts raise a real, substantial, and legitimate doubt regarding a defendant's mental capacity to meaningfully participate in his defense." *Westfall*, 2018 IL App (4th) 150997, ¶ 54. "Relevant factors that the trial court may consider in assessing whether a *bona fide* doubt exists include (1) the defendant's behavior and demeanor, (2) prior medical opinions regarding the defendant's competence, and (3) defense counsel's representations about the defendant's competence." *Id.* (citing *People v. Rosado*, 2016 IL App (1st) 140826, ¶ 31, 61 N.E.3d 1132). "If the trial court concludes that no *bona fide* doubt exists, then it need not conduct a fitness hearing." *Id.* (citing *Hanson*, 212 Ill. 2d at 217).

¶ 46                                   2. *This Case*

¶ 47     The first and most important question this court must address is the following: Did the trial court appoint a psychiatrist because the trial court found a *bona fide* doubt existed regarding defendant's fitness to stand trial, or, alternatively, did the trial court appoint a psychiatrist to examine defendant to help determine whether a *bona fide* doubt exists in the first place? Had the court taken the latter action, its doing so would be consistent with—and authorized by— section 104-11(b) of the Code (725 ILCS 5/104-11(b) (West 2014)).

¶ 48     Here, nothing in the record indicates that the court had a *bona fide* doubt about defendant's fitness to stand trial. The court's written order for examination filed March 7, 2016, makes no reference to its having a *bona fide* doubt. The report of proceedings from the March 7, 2017, hearing in which defense counsel raised this issue is even clearer. At that hearing, defense counsel said, "at this time I would make a Motion for a Fitness Exam *to determine whether a bona fide doubt exists* with respect to Mr. Schnoor's fitness." (Emphasis added.)

¶ 49     Considering the entirety of this record, we conclude that the trial court did not have a *bona fide* doubt as to defendant's fitness when the court appointed a psychiatrist to examine defendant; instead, the court appointed the psychiatrist pursuant to subsection 104-11(b) to assist in the determination of whether a *bona fide* doubt existed at all. Accordingly, defendant was not entitled to a fitness hearing after the psychiatrist's report was submitted to the court and parties (see *Hanson*, 212 Ill. 2d at 217), and the court committed no error by agreeing to the parties' stipulation regarding the report's conclusions.

¶ 50     Although we have concluded that the trial court appropriately handled (1) the appointment of a psychiatrist to examine defendant and (2) the parties' stipulation regarding the psychiatrist's report, we nonetheless suggest that trial courts in similar situations explicitly state on the record that the court did not have a *bona fide* doubt of the defendant's fitness to stand trial when the court appointed the psychiatrist to examine the defendant. To be even more clear, the court might even state that its appointment of a psychiatrist is being made pursuant to section 104-11(b) of the Code. Or perhaps the court could say both. These additional remarks by the trial court would help to make clear that the trial court understood the statutory framework of section 104-11 of the Code.

¶ 51   The parties cite *People v. Contorno*, 322 Ill. App. 3d 177, 750 N.E.2d 290 (2001), and *People v. Cook*, 2014 IL App (2d) 130545, 25 N.E.3d 717, both of which are readily distinguishable from the present case. In each of those cases, the trial court found a *bona fide* doubt regarding the defendant's fitness, unlike this case in which no such finding was made. See *Contorno*, 322 Ill. App. 3d at 178 ("Defense counsel moved for a fitness examination, and the court found that a *bona fide* doubt existed regarding defendant's fitness."); *Cook*, 2014 IL App (2d) 130545, ¶ 3 ("The trial court found a *bona fide* doubt as to defendant's fitness to stand trial and ordered a fitness evaluation.").

¶ 52                              B. Ineffective Assistance of Counsel

¶ 53   Next, defendant argues that he received ineffective assistance of counsel because defense counsel failed to object to irrelevant, inadmissible, and prejudicial other-crimes evidence. The evidence at issue was (1) a recorded admission from defendant that he robbed ATMs and (2) evidence of contraband found in defendant's vehicle.

¶ 54                      1. *The Law Governing Ineffective Assistance Claims*

¶ 55   All defendants enjoy the constitutional right to effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defendant. *People v. Bradford*, 2019 IL App (4th) 170148, ¶ 14, 123 N.E.3d 1285.

¶ 56   To establish deficient performance, a defendant must show his attorney's performance fell below an objective standard of reasonableness. *Id.* It is not sufficient for a defendant to show that counsel's representation was imperfect because the constitution guarantees only a reasonably competent attorney. *Harrington v. Richter*, 562 U.S. 86, 110 (2011) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). Instead, a defendant must show his lawyer's representation undermined the proper functioning of the adversarial process to the extent that the defendant was denied a fair trial. *Id.* (citing *Strickland*, 466 U.S. at 686).

¶ 57   To prevail on an ineffective assistance of counsel claim, a defendant must satisfy both prongs of the *Strickland* test. *People v. Carlisle*, 2015 IL App (1st) 131144, ¶ 73, 35 N.E.3d 649 (citing *People v. Colon*, 225 Ill. 2d 125, 135, 866 N.E.2d 207, 213 (2007)); *People v. Evans*, 209 Ill. 2d 194, 220, 808 N.E.2d 939, 954 (2004). If such a claim can be disposed of because the defendant suffered no prejudice, we need not address whether counsel's performance was deficient. *People v. Jackson*, 2018 IL App (3d) 170125, ¶ 24, 116 N.E.3d 996.

¶ 58                                      2. *This Case*

¶ 59   Defendant's ineffective assistance of counsel claim fails because he clearly was not prejudiced by the introduction of the other-crimes evidence at issue. The evidence of his guilt was overwhelming: the weapon and disguise used in the crime were found in his vehicle, the recorded interview in which he essentially confesses to the bank robbery was played for the jury, and currency traceable to the Marine Bank was found in his hotel room. Further, he admitted to robbing the bank in his testimony during trial. Defendant asserted the affirmative defenses of compulsion and mistake of fact, but the jury rejected them and found him guilty.

¶ 60    We view this case as being similar to *Carlisle*, 2015 IL App (1st) 131144, ¶ 74, in which the First District wrote that "[t]he overwhelming evidence of defendant's guilt in this case precludes defendant from being capable of showing that there was a reasonable probability that the outcome of the case would have been different if defense [counsel's performance had not been deficient.]"

¶ 61    Because defendant's ineffective assistance of counsel claim fails to satisfy the prejudice prong of that claim, we reject his claim and need not address whether defense counsel's performance was deficient.

¶ 62                                C. *Krankel* Inquiry

¶ 63    Next, defendant argues that the trial court erred when it failed to conduct a *Krankel* inquiry in relation to defendant's claim that his trial counsel was ineffective for failing to object to other-crimes evidence. We disagree because (1) defendant's complaint about the other-crimes evidence did not trigger a *Krankel* inquiry and (2) the *Krankel* inquiry that the court in fact conducted was sufficient for the claims that were actually raised.

¶ 64                         1. Krankel *Hearings in General*

¶ 65    The common law procedure first recognized in *Krankel* "serves the narrow purpose of allowing the trial court to decide whether to appoint independent counsel to argue a defendant's *pro se* posttrial ineffective assistance claims." *People v. Patrick*, 2011 IL 111666, ¶ 39, 960 N.E.2d 1114. The only issue to be decided at a *Krankel* hearing is whether new counsel should be appointed. *Id.*

¶ 66                            a. Triggering *Krankel*

¶ 67    A *Krankel* hearing is required "when a defendant raises a *pro se* posttrial claim of ineffective assistance of trial counsel." *People v. Ayres*, 2017 IL 120071, ¶ 11, 88 N.E.3d 732. A defendant must clearly assert a claim of ineffective assistance of counsel to trigger a *Krankel* hearing. *People v. Roddis*, 2018 IL App (4th) 170605, ¶ 55, 119 N.E.3d 52. When such a claim is merely implicit or could be subject to different interpretations, a *Krankel* inquiry is not required. *Id.*; *People v. Thomas*, 2017 IL App (4th) 150815, ¶ 26, 93 N.E.3d 664.

¶ 68    Typically, a defendant must at least mention his attorney in connection with his complaints for them to be considered ineffective assistance of counsel claims. See, *e.g.*, *Thomas*, 2017 IL App (4th) 150815, ¶ 26 (finding a hearing was not required where defendant failed to mention his attorney in his letter to the trial court complaining about his sentence); *People v. King*, 2017 IL App (1st) 142297, ¶ 20, 80 N.E.3d 599 (*Krankel* not implicated when defendant, without mentioning her attorney, claimed error because a witness was not called).

¶ 69    Defendant cites *People v. Demus*, 2016 IL App (1st) 140420, 47 N.E.3d 596, and *People v. Lobdell*, 2017 IL App (3d) 150074, 83 N.E.3d 502, in support of his argument that a defendant need not use the words "ineffective assistance of counsel" to trigger a *Krankel* inquiry. Although defendant's assertion is correct, both *Demus* and *Lobdell* involved situations in which the defendant explicitly mentioned his attorney as a part of his complaint, unlike the situations in *Thomas*, *King*, and this case. These cases illustrate what, at a minimum, a defendant must say to trigger a *Krankel* inquiry: (1) he has a complaint about trial proceedings and (2) that complaint involves something his attorney did or failed to do. When the defendant

- 9 -

does not inform the trial court that defendant's complaint about trial proceedings concerns defense counsel, conducting a *Krankel* hearing based upon some generic complaint is not necessary.

¶ 70                             b. The Sufficiency of the *Krankel* Inquiry

¶ 71       A reviewing court should consider three factors when determining whether a *Krankel* inquiry was sufficient: (1) whether there was some interchange between the trial court and defense counsel regarding the facts and circumstances surrounding the allegedly ineffective representation, (2) the sufficiency of defendant's *pro se* allegations of ineffective assistance, and (3) the trial court's knowledge of defense counsel's performance at trial and the sufficiency of the defendant's allegations on their face. *People v. Moore*, 207 Ill. 2d 68, 78-79, 797 N.E.2d 631, 638 (2003). None of these factors are mandatory, and no bright-line rule exists about what is a sufficient inquiry and what is not. The Illinois Supreme Court specifically used permissive rather than mandatory language in describing the utilization of these factors. *People v. Jolly*, 2014 IL 117142, ¶ 30, 25 N.E.3d 1127 (characterizing the actions above as "permissible and usually necessary," "may," and "is permitted," respectively).

¶ 72                                                2. *This Case*

¶ 73       Defendant filed a *pro se* addendum to defense counsel's motion for a new trial that contained three complaints, as follows:

> "1. The usage of other crimes evidence involving the idea created a prejudicial effect that outwit [*sic*] it's [*sic*] probative value when combined with Agent Echols testimony.
>
> 2. The state failed to establish chain of custody for def's handwritten statement for the time period of 9:14:31pm to
>
> 3. The usage of other crimes evidence involving atm's."

¶ 74       None of the above complaints mentioned defendant's attorney or ineffective assistance of counsel. When defense counsel provided the trial court with that addendum at the hearing on his posttrial motion, *counsel* stated, "we would like to incorporate those issues that he raises [in the addendum], which I am told include an allegation of my ineffectiveness." However, counsel's statement was the only mention of any allegation of ineffectiveness at that hearing, and the court did not conduct a *Krankel* hearing at that time.

¶ 75       Defendant acknowledges that the next day, after sentencing, the trial court did conduct a *Krankel* hearing. Defendant does not appear to argue that the court erred when it determined that the claims raised *in that hearing* did not warrant the court's appointment of new counsel for defendant to further pursue a claim that defendant's trial counsel was ineffective. Instead, defendant argues that the court erred by not inquiring about the claims raised in the addendum the previous day.

¶ 76       The first question is whether the *pro se* addendum should have triggered a *Krankel* inquiry. Defendant's addendum did not explicitly mention anything related to his attorney. Like the circumstances in *King* and *Thomas*, defendant in this case complained about the trial court proceedings without mentioning that his complaint involved something his attorney did or failed to do. Therefore, defendant was not entitled to a *Krankel* hearing based upon the contents of the addendum.

¶ 77    Nonetheless, the trial court decided to conduct a *Krankel* hearing the next day at the sentencing hearing, so the second question is whether the *Krankel* inquiry the court then conducted was sufficient.

¶ 78    An interchange between defense counsel and the trial court occurred in which the court questioned counsel about the quality of her representation. The court then also provided defendant ample opportunity to explain his claims. When defendant appeared to stray from matters related to the effective assistance of counsel, the court asked defendant if he had any further ineffective assistance of counsel claims. Defendant said he did not and made no mention of concerns about other-crimes evidence. He did not tell the court that he believed the complaints in the addendum showed counsel was ineffective, and he did not mention the addendum at all.

¶ 79    The trial court provided defendant all the opportunity the law requires for defendant to flesh out his claims of ineffective assistance. We disagree with defendant's contention that the court was somehow obligated under these circumstances to remind defendant of the other-crimes issue he had mentioned the previous day in his addendum and to ask defendant if he wanted to include that issue at the *Krankel* hearing.

¶ 80    Because the trial court properly conducted a *Krankel* inquiry (even though the court was arguably not required to do so based upon the addendum) and that inquiry was sufficient under the law, no error occurred.

¶ 81                D. Defendant Was Not Punished for Exercising His Right to Trial

¶ 82    Defendant argues that his due process rights were violated because (1) the State recommended a longer sentence than it would have agreed to if defendant had pleaded guilty and (2) the trial court imposed a longer sentence because defendant exercised his right to a trial. We disagree because (1) when a defendant is convicted at trial after rejecting the State's offer during plea negotiations, the State is not bound by its offer and (2) the trial court is not bound by a proposed plea agreement when the court did not itself make an offer to a defendant regarding what sentence it would impose if he pleaded guilty.

¶ 83                                        1. *The Law*
¶ 84            a. The State Is Not Bound by Plea Negotiations That Defendant Rejected
¶ 85    This court previously disposed of the notion that the State is in any way bound by an offer it made in negotiations with a defendant when that defendant has rejected the State's offer and been convicted after trial. See *People v. Wheeler*, 2019 IL App (4th) 160937, ¶ 50, 126 N.E.3d 787. "[T]he State's offer during plea negotiations is an improper basis upon which to attack the length of a criminal sentence imposed after trial." *Id.* States attorneys enjoy wide discretion in the initiation and management of criminal cases, and this discretion includes plea bargaining. *Id.* ¶ 51. We note that the United States Supreme Court has recognized the importance of plea negotiations, stating that "well over three-fourths of the criminal convictions in this country rest on pleas of guilty, a great many of them no doubt motivated at least in part by the hope or assurance of a lesser penalty than might be imposed if there were a guilty verdict after a trial to judge or jury." *Brady v. United States*, 397 U.S. 742, 752 (1970). Requiring that a prosecutor's sentencing recommendation after trial may not exceed the sentence the prosecutor

was willing to settle for if defendant had pleaded guilty makes no sense and would have serious adverse consequences on the plea-bargaining process.

¶ 86     We now reiterate what we said in *Wheeler*: If the State makes a plea offer to a defendant, the State is not bound by that offer should the defendant reject that offer and be convicted after trial. Further, the State's prior offer is not a legitimate basis upon which defendant may attack the length of his sentence when he has been convicted after trial.

¶ 87                          b. The Trial Court Is Not Bound by Plea Negotiations

¶ 88     " 'A trial court may not punish a defendant for exercising his right to a trial.' " *People v. Musgrave*, 2019 IL App (4th) 170106, ¶ 69 (quoting *People v. Sturgeon*, 2019 IL App (4th) 170035, ¶ 113, 126 N.E.3d 703). It must be clearly evident that a harsher sentence resulted from a defendant's demand for a trial. *Id.* (citing *People v. Jones-Beard*, 2019 IL App (1st) 162005, ¶ 26)

¶ 89     Fundamentally, the trial court is not bound in any way by the State's sentencing recommendation. *Sturgeon*, 2019 IL App (4th) 170035, ¶ 117. "[T]he mere fact that the defendant was given a greater sentence than that offered during plea bargaining does not, in and of itself, support an inference that the greater sentence was imposed as a punishment for demanding a trial." (Internal quotation marks omitted.) *Id.* ¶ 113.

¶ 90                                      2. *This Case*

¶ 91     In the present case, the State offered defendant a 15-year sentence in a Rule 402 conference the trial court conducted. During the conference, the State summarized defendant's criminal history and described some of the details of the offense and monetary loss. The trial court said that such a sentence was "appropriate" and "reasonable" but noted that if defendant opted for an open plea, the sentence could be more or less depending on what was presented at the sentencing hearing. Ultimately, after defendant was convicted, the State recommended 25 years in prison, and the court sentenced him to 25 years in prison. We reject defendant's contention that anything about this sequence of events violated his right to due process.

¶ 92     First, as previously stated in our discussion of *Wheeler*, the State is not bound by an offer it made in plea negotiations that defendant rejected. The State's plea offer has no bearing on what the State may recommend in sentencing when a defendant is convicted after trial.

¶ 93     Second, when considering defendant's claim that the trial court abused its discretion by imposing an unduly harsh sentence on defendant, we emphatically reiterate that what the State may have offered defendant during plea negotiations *is irrelevant*. See *Musgrave*, 2019 IL App (4th) 170106, ¶ 76 (holding that the mere fact that the trial court sentenced the defendant to a longer prison term than the one offered during plea negotiations does not show that it was " 'clearly evident' that the trial court punished [the] defendant for rejecting a plea agreement and proceeding to trial"). The only situation in which this rule would not apply is if (1) the court itself is an active participant in the plea-bargaining process and (2) it is the court who in fact makes a plea offer of its own to the defendant. We recognize, of course, that such conduct by the trial court would be improper and a violation of Rule 402, but we also understand that there may be trial courts in Illinois that in fact engage in such conduct—that is, the trial court literally becomes the party bargaining with a defendant over what sentence the court will impose if the defendant pleads guilty. Of course, such an error can only come about if the court

holds a Rule 402 conference in the first place. (On this point, we reiterate what we wrote in *Sturgeon* and repeated in *Musgrave*: " 'Rule 402(d) *permits* but does not *require* trial courts to engage in such conferences, and many experienced trial judges refuse to engage in such conferences because those judges deem them both unseemly and unnecessary.' " (Emphases in original.) *Id.* ¶ 86 (quoting *Sturgeon*, 2019 IL App (4th) 170035, ¶ 118).

¶ 94　　In the present case, the trial court was not a party to the plea negotiations and did not make an offer at any time to defendant. Essentially, all the court said was that it was not unwilling to put its judicial imprimatur on the proposed guilty plea agreement. By telling the parties it would accept the agreement, all the court was saying is that it could tolerate the agreement, nothing more. We note that the rejection of a plea agreement, by contrast, is an extraordinary and rare act in which the court voices its unwillingness to tolerate the State's offer. When, as here, the court did not create an offer, the court need not—and should not—consider plea negotiations when determining the appropriate sentence for a defendant.

¶ 95　　　　　　　　　　　　E. Defendant's Sentence Was Not Excessive
¶ 96　　Defendant argues that his sentence was harsh and excessive. We disagree.

¶ 97　　　　　　　　　　　　　　　　　1. *The Law*
¶ 98　　The Illinois Constitution requires that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. In determining a sentence, the trial court's decision is given great deference. *People v. Alexander*, 239 Ill. 2d 205, 212, 940 N.E.2d 1062, 1066 (2010).

¶ 99　　The standard of review when a defendant contends his sentence is excessive is whether the trial court's sentencing determination constituted an abuse of discretion. *People v. Rucker*, 260 Ill. App. 3d 659, 664, 633 N.E.2d 146, 150 (1994). An abuse of discretion occurs when the sentence differs greatly from the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense. *People v. Snyder*, 2011 IL 111382, ¶ 36, 959 N.E.2d 656. The defendant must affirmatively establish that the sentence was based on improper considerations. *People v. Williams*, 2018 IL App (4th) 150759, ¶ 18, 99 N.E.3d 590.

¶ 100　　　　　　　　　　　　　　　2. *This Case*
¶ 101　　Defendant argues that his sentence is excessive in view of (1) the severity of the offense, (2) his mental illness, and (3) his rehabilitative potential. We conclude that the sentence of 25 years was not excessive.

¶ 102　　First, his criminal conduct was quite severe. Although no one was hurt, he committed a bank robbery in a very threatening manner by pointing a fake gun at a bank teller. We note that although the weapon was later found to be a BB gun and not to be a deadly firearm, this does nothing to diminish the terror felt by the people in the bank who truly may have believed their lives were in danger. Further, defendant did not accept responsibility for his actions, instead concocting a delusional story that purported to excuse him of any wrongdoing.

¶ 103　　Second, defendant's claimed mental illness does not support his claim that the sentence was excessive. Defendant committed felonies in the past while suffering from the same mental illness he claims to have been suffering from when he committed the crimes in this case. "[A]

- 13 -

defendant's mental or psychological impairments are not inherently mitigating." *Wheeler*, 2019 IL App (4th) 160937, ¶ 44. Instead, the Illinois Supreme Court has held that a judge at sentencing may consider mental health issues as either aggravating or mitigating depending "on whether the individual hearing the evidence finds that it evokes compassion or demonstrates possible future dangerousness." (Internal quotation marks omitted.) *People v. Madej*, 177 Ill. 2d 116, 139, 685 N.E.2d 908, 920 (1997). It is unclear to what extent the trial court considered defendant's claimed mental illness; to the extent that the court did at all, the court would have not erred if it considered his mental health to be a factor in aggravation.

¶ 104    Third, the record contains little evidence of rehabilitative potential. Defendant has a significant and serious criminal history. In 1996, he was sentenced to 15 years in prison for residential burglary. In 2006, he violated his parole and returned to prison. In 2007, he was sentenced to four years and six months in prison for threatening a public official. In 2008, he violated his parole and returned to prison. In 2008, he was sentenced to 12 months of probation for misdemeanor domestic battery. In 2009, defendant's probation was revoked, and he was sentenced to 90 days in jail. In 2011, defendant was sentenced to nine years and six months in prison for possession of a stolen vehicle.

¶ 105    We conclude that the trial court did not abuse its discretion by sentencing defendant to 25 years in prison.

¶ 106                               III. CONCLUSION

¶ 107    For the reasons stated, we affirm the trial court's judgment.

¶ 108    Affirmed.